Daniel F. Lafean and George W. Williams, trading and doing Business as The P. C. Wiest Co. *v.* Wm. H. Weeks and W. H. Weeks Co., Ltd., Appellants.

[Marked to be reported.]

*Trade-marks—Unrestricted liberty in the practice of arts or trades—Signs, words and symbols in business—Exclusive privilege.*

The rule is unrestricted liberty in the practice of all arts and trades, and in the use of methods by which they are conducted. He who asserts the right to an exclusive privilege in any department of business must bring himself under the protection of some recognized exception to the rule.

A tradesman has a right to the exclusive use of such signs, words, or symbols as he may have adopted and used in his business to distinguish articles of his own production from all similar articles produced by other persons.

*Trade-marks—Initials—Boxes—Labels—Injunction.*

On a bill in equity in a trade-mark case, it appeared that plaintiffs described their mark for registration in the Patent Office as follows: " Our trade-mark consists of the letters ' P. C. W.' These letters have generally been arranged as shown in the accompanying fac-simile in which they appear as script, printed in a horizontal line upon a back ground of any suitable color; but other forms of letters may be employed, or they may be differently arranged without materially altering the character of our trade-mark, the essential features of which are P. C. W." The letters " P. C. W." were the initials of the senior member of plaintiff's firm. The defendants' trade-mark was described for registration as consisting of the letters " W. H. W., made in script in white on a dark ground." The letters " W. H. W." were the initials of the founder of defendants' business. Both plaintiffs and defendants were engaged in manufacturing confectionery, and both used the marks above described on boxes in which caramels were packed. These boxes were known as stock boxes, and were manufactured by box makers, and sold to the public generally. The court below issued an injunction restraining defendant from using the letters W. H. W. printed in script, in white, in a horizontal line upon a red background. *Held*, to be error.

*Trade-mark—Invention—Exclusive right—Boxes of particular size and shape.*

A tradesman can have no exclusive right to mathematical lines, to styles of printing or colors.

Where box manufacturers make boxes for a particular trade designed to contain an even number of pounds or fractions of a pound, and are uniform in size and general appearance, and such boxes are sold to the public generally, one dealer cannot obtain an exclusive right to use such boxes of a particular size and shape in connection with a particular article which he manufactures.

Where one invents a machine, or a new combination, or devises a new article, he contributes the result of his skill and his inventive powers to the public, if he does not take the necessary step to secure himself an exclusive right to use and vend his invention. The ground on which the courts will interfere in such cases is to protect the inventor from the attempt of his neighbor to sell his own work as and for the work of the inventor.

Argued April 19, 1895.   Reargued April 16, 1896.   Appeal, No. 385, Jan. T., 1895, by defendants, from decree of C. P. Luzerne Co., May T., 1893, No. 2, on bill in equity.   Before Sterrett, C. J., Green, Williams, McCollum and Mitchell, JJ.; and also on reargument Dean and Fell, JJ.   Reversed.   Mitchell, Dean and Fell, JJ., dissent.

Bill in equity to restrain an alleged fraudulent infringement of a trade-mark.

The case was referred to L. H. Bennett, Esq., as master, who found that Peter C. Wiest, in 1872, founded the business of the manufacture and wholesale and retail of confectionery; that in 1883 he adopted the initials of his name, " P. C. W.," in the form of spencerian script in white on a red background as a trade-mark ; that he transferred his business with the trade-mark in 1885 to the firm of P. C. Wiest & Company, composed of Peter C. Wiest and Daniel F. Lafean, who caused it to be registered in the Patent Office at Washington on the 27th day of May, 1890, as of No. 17957.   The statement or specification accompanying the application on which this registration was based was " Our trade-mark consists of the letters, ' P. C. W.' These letters have generally been arranged as shown in the accompanying facsimile in which they appear in script printed in a horizontal line upon a background of any suitable color, but other forms of letters may be employed, or they may be dif-

ferently arranged without materially altering the character of our trade-mark, the essential features of which are the letters, 'P. C. W.' This trade-mark has been used continuously by us in business since about January, 1883. The class of merchandise to which this trade-mark is appropriated is confectionery and the particular description of goods comprised in such class on which it is used is candies. It has been our practice to mark the trade-mark upon the boxes and papers of all kinds in which the confectionery is packed." This trade-mark was formally transferred and assigned with the business on the 18th of January, 1892, to the new firm of P. C. Wiest & Company, organized on that day, and by said company transferred and assigned to the present plaintiffs when the firm was organized on the 9th day of December, 1892. This trade-mark and label has been used continuously since its adoption in 1883 by the said Peter C. Wiest and the different firms aforesaid which have succeeded to the business, by being placed upon the boxes and packages of candies and caramels manufactured and sold in that business. The business has been a large and constantly increasing one, so that for some years it has had a capital stock of over $100,000, and employed between four hundred and five hundred people in the city of York, and its sales have run up to several tons of confectionery daily and thousands of cases yearly, consisting in large measure of what are known in the confectionery business as caramels, made from different ingredients, and having different distinguishing names. These goods have attained a good deal of popularity throughout the country in jobbing and retail confectionery trade as of superior quality and desirability, and by reason of the name of the founder of the business, the preservation of his name in the different succeeding firms, and the trade-mark and label already referred to, these goods have become well and widely known as the "P. C. W." or the "P. C. Wiest" goods.

11. The defendant, William H. Weeks, has been engaged in the confectionery business to a greater or less extent for the last twenty years in the borough of Hazleton, this county. Since October, 1892, he has been associated in his business with Henry Loechel of Pottsville. In the beginning it was proposed between him and his partner that their firm should be in the form of a limited association to be called "W. H. Weeks Company,

Limited," but no papers were executed in pursuance of this plan, and after carrying on the business as W. H. Weeks Company, Limited, up to the 1st of January, 1893, the name was changed to and has since existed as that of "W. H. Weeks Company."

12. Formerly the business of the defendant, William H. Weeks, was mainly that of a jobber and retailer of confectionery, but for a number of years he has also manufactured, to some extent, what are called "plain goods" and "caramel" goods. The caramel goods manufactured by him, however, were not put up and sold in boxes with labels upon them until the spring of 1891, although in 1886 or 1887 he adopted and used for certain purposes, a rough form of label with the Roman letters "W. H. W.," being the initials of his name. From 1885 to 1891, he handled the P. C. Wiest goods put up in boxes and packages bearing upon them the P. C. W. trade-mark.

13. In the spring of 1891, however, the defendant, William H. Weeks, ceased handling the P. C. Wiest goods and began the manufacture of caramels on a larger scale than previously, and to put up caramels of his own manufacture in the form of boxes and packages of a character similar to those used by the plaintiffs. At the same time he remodeled as his trade-mark the initial letters of his name "W. H. W." by using them on a finer label in the form of spencerian script, in white on a red background, and continuously since then this trade-mark and label have been used by him and the firm of W. H. Weeks Company which succeeded him, by being placed upon boxes and packages of candies and caramels manufactured and sold by them.

14. For a long time prior to and ever since the adoption of the P. C. W. label and trade-mark, the plaintiffs and their predecessor in the business put and have been putting up the candies and caramels manufactured and sold by them, in square or nearly square strawboard or pasteboard boxes of different sizes, sometimes painted or colored red on the outside and sometimes of the natural color of the board as manufactured. On the ends of these boxes proper the red label with the trademark "P. C. W." upon it has been placed, and on the end of the box cover corresponding with the labeled end of the box, the names given to the confectionery inside have been put, with the number of single pieces of confectionery contained therein, and the

addition of certain numbers of these pieces "for one cent," these words and figures being indicative in themselves, not of the origin or ownership of the confectionery, but more particularly of the somewhat arbitrary names given to it, of the quantity contained in the box, the size of the pieces comprising its total contents and the number of these pieces that may be sold "for one cent."

So also, since the adoption or remodeling of the W. H. W. label and trade-mark by the defendant, William H. Weeks, and its use by him and the W. H. Weeks Company, he and this company have put up candies and caramels manufactured and sold by them in boxes of the same size, material and color as or at least similar to those used by the plaintiffs and their predecessors; and likewise, on the ends of the defendants' boxes the W. H. W. label has been placed; while on the corresponding end of the box cover have been put names which in many cases are alike or show greater or less similarity to those upon the plaintiffs' boxes, and with the same numbers upon them. Some of the names, numbers, etc., on the covers of the boxes of the plaintiffs and defendants respectively are here given, as follows:

| *Names on Plaintiffs' Covers.* | *Names on Defendants' Covers.* |
|---|---|
| "720 White Caps. 10 for 1 cent." | "10 for 1 cent. White Caps. 10 for one cent." |
| (Pltffs Ex. 1, June 21, '93.) | (Defts. Ex. V.) |
| "144 Giants. 2 for 1 ct." | "144 Giants. 2 for one cent." |
| (Pltffs Ex. W.) | (Plaintiffs Ex. O, July 11, '93.) |
| "144 Great Guns. 2 for 1 cent." | "144 Big Guns. 2 for 1 cent." |
| (Pltffs Ex. G. Jun 21, '93.) | (Deft Ex. H.) |
| "288 N. O. Bluffs. 4 for 1 cent." | "288 N. O. Corkers. 4 for 1 cent." |
| (Pltffs Ex. H. Jun 21, '93.) | (Defts Ex. W.) |
| "144 Great Scott. 2 for 1 cent." | "144 Mammouth Caramels 2 for 1 cent." |
| (Defts, Ex. D2.) | (Defts Ex. E2.) |
| "Molasses Caramel. 4 for 1 cent." | "400 New Orleans, 4 for 1 cent." |
| (Pltffs Ex. F. Jun 21, '93.) | (Defts Ex. U.) |

15. With respect to the comparative contents of the boxes of the plaintiffs and defendants respectively, which are labeled as last above shown, a very striking similarity exists between those set opposite each other in the above statement of names. To be more specific; the White Caps in either box are a small, oval shaped candy of the same general size, form and color; the Giants in either are a large square caramel of the same form and dimensions, and the same may be said of the Great Scott and Mammouth caramels respectively. The Great Guns, respectively, are a long stick candy of equal dimensions and of the consistency of a caramel; while the N. O. Bluffs and N. O. Corkers are each in the form of a shorter stick of the color of molasses candy as popularly known; and the Molasses caramel and New Orleans respectively, are each a small, square caramel of like form, color and dimensions, made of New Orleans molasses.

16. With respect to similar kinds of confectionery manufactured and sold by the respective parties, there is no marked or substantial superiority in quality in those of either party over those of the other.

17. In the months of July and August, 1892, the firm of P. C. Wiest & Company, consisting of Peter C. Wiest, Daniel F. Lafean and George W. Williams (being the firm which immediately preceded the plaintiffs), had a correspondence with the defendant, William H. Weeks, who was then carrying on business by himself, wherein the former informed the latter that for some time past he had been infringing upon their registered trade-mark, which called for the letters " P. C. W." printed in spencerian style horizontally across a red label, and warned him that unless he desisted from further infringement they would restrain him from using the label which he had adopted. Mr. Weeks replied that he thought he had a perfect right to use his own label or any other that would not be " P. C. W." That he had submitted the matter to the best authority he knew of and should be governed by their advice; that there were some conflicting decisions in parallel cases, and just at present he could not decide which was the best course to pursue, but hoped in a few days to arrive at the facts. No further communication seems to have taken place on the subjects, but,—

18. On the 13th of September, 1892, the defendant, William H. Weeks, caused a trade-mark to be registered in the Patent Office at Washington as of No. 21743. The statement or specification accompanying the application or declaration on which this registration is based is as follows:

"The trade mark consists of the letters 'W. H. W.' in spencerian or script. These generally have been arranged as shown in accompanying fac-simile, in which they appear in white on a dark ground; but the details may be varied, the essential features being the letters 'W. H. W.' in script. These letters have been used as a trade mark continuously by me in my business since about the first of January, 1887. The class of merchandise to which the trade mark is appropriated is confectionery, and the particular description of goods comprised in said class on which it is used by me, is candies, such as sticks, toy forms, caramels, and plain confections, and candied fruits, leaves, nuts and the like. The mark is applied to the goods by producing it on the boxes and the labels thereon, and is also used on stationery and in advertisements."

19. The trade-mark and label adopted by Peter C. Wiest in 1883, and subsequently used as stated in the 6th and 14th findings of fact, a facsimile of which was registered on the 27th of May, is correctly represented in the plaintiffs' exhibit, "D," part of the exhibits in the cause, with the exception that in some cases a smaller size label with proportionately smaller letters has been and is used upon certain sizes of boxes and packages.

20. The rough form of label with the trade-mark "W. H. W." in Roman letters, which was adopted and used by the defendant, William H. Weeks, between 1887 and 1891, as stated in the 12th finding, is correctly shown in plaintiffs' exhibits, "U" and "V," part of the exhibits in the cause, while the label and trade-mark adopted or remodeled by the said William H. Weeks and since used by him and the firm of W. H. Weeks Company, as stated in the 13th and 14th findings, are correctly exhibited in defendants' exhibit, "B," except that in certain cases this trade-mark and label, in a proportionately smaller form, are used upon certain boxes and packages. The facsimile of the trade-mark as registered by William H. Weeks on the 13th of September, 1892, as stated in the 18th finding, is shown on defendants' exhibit, "A," wherein it appears that the label or

background is black, instead of being red, like those actually used by the defendants in their business.

\*      \*      \*      \*      \*      \*      \*      \*      \*

Perhaps the most material allegation of the bill is that the trade-mark and label of the defendants bear such similarity of appearance to that of the plaintiffs as to be likely to deceive persons purchasing goods of the former and lead such persons and purchasers to the belief that they are purchasing the plaintiffs' goods. The plaintiffs, in support of this allegation, and the defendants, in denial of it, necessarily rely, in great measure, upon the evidence appearing pro and con from inspection and comparison of the respective labels and trade-marks themselves, as shown in the exhibits in evidence; as, for example, from a comparison of plaintiffs' exhibit, " D," referred to in the 19th finding, as an exhibit of their label and trade-mark, with that of the defendants, shown in exhibit " B," referred to in the 20th finding. So also upon the inspection and comparison of the boxes of confectionery of the respective parties, such as those referred to in the 14th finding, with the labels on the ends of the boxes and the names and numbers on the corresponding ends of the box covers. This evidence of the boxes and labels themselves is supplemented on either side by oral testimony.

On the part of the plaintiffs were called, namely: Peter C. Wiest, who was formerly connected with the business, George W. Williams, one of the plaintiffs, Charles B. Metzger; Clark E. Dougherty, Edward Switzgable, E. E. Aston, and James Case, each testifying to his familiarity with the goods and trade-mark of the respective parties. The substance of this evidence is as follows: That of Mr. Wiest is that while he can see a difference on close inspection, yet a person of ordinary intelligence would be misled by the similarity of the labels, and that defendants' method of putting up and packing their goods in boxes with their trade-mark attached, so resembles that of the plaintiffs as to be calculated to deceive buyers. Also that he has often heard complaints of that character from the trade. That of Mr. Williams is that defendants' packages and label are calculated to deceive buyers in general; while Mr. Dougherty thinks the deception would occur with many of the people with whom he deals, who are more or less ignorant; and Messrs. Metzger and Case say the deception would occur to persons not ac-

customed to handling the goods. Mr. Metzger, however, says he would not be deceived nor would an ordinarily prudent man, if he made close examination. Mr. Switzgable says the similarity between the labels is so close that a person who came into his store thought, from seeing the plaintiffs' goods and label there, that the witness was handling the goods of the defendants ; while Mr. Aston says that after handling the Wiest goods for a number of years he, in asking for more of these, received instead, from the person from whom he was buying, a quantity of the Weeks goods, and only discovered the mistake when, his customers afterwards made complaint as to the quality of the latter goods, he examined the boxes and found that they were the goods of the defendants.

As opposed to these seven witnesses, eleven are called in behalf of the defense of whom all say that they are familiar with the goods and trade-marks of the respective parties, and most of whom have also bought and sold the goods of either. These witnesses are William H. Weeks, Thomas W. Haines, Frank E. Weeks, F. W. Pedrick, John Specht, John C. Bush, James F. Hubley, J. B. Labaugh, Frank Seely, Frank Toole and John L. Perkins. Eight of these say that in their opinion persons who could and would actually read the two labels would not be deceived in purchasing the Weeks goods with the belief that they were purchasing the Wiest goods. Five of these eight, as also the ninth and the tenth witnesses say that persons of ordinary intelligence and prudence would not be deceived, while the eleventh one says he cannot tell whether persons of the character last referred to would be deceived, but thinks one who could read very plain would not take one label for the other. Such of these several witnesses as were asked the question say that they, personally, would not be deceived by the similarity of the labels, that they never have been, and never heard of others who were. In the course of the cross-examination of these different witnesses, however, the existence of a greater or less similarity between the two labels is admitted. Most of them, when questioned, concede in the two a similarity in the red background in the white lines indicating the letters " P. C. W." and " W. H. W." respectively, in their general character as spencerian script, in the white border lines, and in the letters " C. W." of the plaintiffs' trade-mark as

compared with the last " W " and the last half of the " H " in the defendants'. Those who are asked also admit a similarity in the white block letters of the words " trade mark " on each label, and three of these further admit that the general appearance of the two labels is similar. Two of them add that a person who was not looking out might easily take one of the boxes for the other, and another says that the same would be the case of a person who could not read writing.

While it is entirely proper to carefully consider the oral testimony to which reference has just been made, and to give it its due weight in arriving at the truth, it is nevertheless the duty of the court or master in passing upon the question of similarity of appearance of the two labels, to also make personal inspection of them, and from such inspection as well as from the oral evidence to ascertain the proper conclusion to be reached. See Crucible Co. v. Guggenheim et al., 7 Phila. 410 ; Heinz v. Lutz, 146 Pa. 610.

As has been shown, a portion of the evidence for the defense is to the effect that persons who could and would actually read the two labels would not be deceived in purchasing the Weeks goods with the belief that they were buying those of the Wiest manufacture. Quite likely this is true so far as concerns wholesale dealers who know of the two manufactories, for as the trademark P. C. W. indicates goods manufactured by P. C. Wiest and his successors, and the trade-mark W. H. W. designates those manufactured by W. H. Weeks, these wholesalers who could and would carefully read all these initials would see that they are not the same. But the master is of the opinion that this is not the true test upon which the issue is to be decided.

As was said in Crucible Co. v. Guggenheim, supra, " Of the two labels and trade marks there involved (the one containing the words ' Stove Polish, Dixons prepared Carburet of iron' and the other 'J. C. Dixons Stove Polish, Carburet of iron ;') it is true the wholesale dealers may generally understand the difference between the two articles and may not sell J. C. Dixons for the Joseph Dixon, but the small retail dealers scattered all over the world do not so understand this distinction, and if they did might not regard it, much less would their customers, many of whom are ignorant people, sometimes servant girls sent to the store by their employers, recognize any difference between them

or know whether they were buying the Dixon Stove Polish which has been celebrated for so many years, or the article manufactured and sold by the defendants." In the case of Heinz v. Lutz, supra, there was evidence of the character just referred to, and yet the court held that the true inquiry was whether the offending label was such as to be likely to deceive persons of ordinary intelligence. In the same case on this point the court also stated the issue substantially to the same effect by saying in another connection that the label complained of must be so similar in appearance that any person using such reasonable care and observation as the public generally are capable of using and may be expected to exercise, would mistake the one for the other. And again, that in order to entitle the plaintiffs to relief by injunction, the resemblance must be such that ordinary purchasers dealing with ordinary caution are likely to be misled. The above case was followed in Brown et al. v. Seidel, 153 Pa. 60, where it was held " it is not enough that there may be a possibility of deception. The offending label must be such that it is likely to deceive persons of ordinary intelligence."

In the light of these legal tests to be observed in ascertaining whether the label and trade-mark complained of offend against the law, the master further finds as conclusions of fact:

21. The defendants' trade-mark and label bear such similarity of appearance to those of the plaintiffs as to be likely to deceive persons of ordinary intelligence, measured by the general standard of the mass of people dealing in and buying such goods, and using reasonable care and caution, and to mislead them into the belief that they are purchasing the goods of the plaintiffs' manufacture when in fact they are buying the goods manufactured by the defendants, and this liability to deception on the part of such dealers and buyers is still further induced by the imitative style of the boxes and packages in which the defendants' goods are packed and the similar names given to the candies and caramels contained therein ; moreover, the master concludes from the evidence, that cases of actual deception in this behalf have taken place.

22. The circumstances hereinbefore set forth ; of the popularity of the Wiest goods ; of the handling of them by the defendants' predecessor, William H. Weeks, for a number of years prior to 1891, of his ceasing to handle them at the time, and his

increase of his own manufactures; taken with the facts of the change of his trade-mark, "W. H. W.," from the Roman letters to the spencerian script, wherein the last half of the letter H and the whole of the last W so closely correspond with the letters C W of the plaintiffs' trade-mark; the adoption, at the same time, of the form of boxes and packages used by the plaintiffs, and the similar names given to the confectionery manufactured; the persistence, when finally warned against it, in using the new style of label and the subsequent registration of the trade-mark in the Patent Office; when considered in connection with the oral testimony in relation to the change of label and trade-mark, lead to the further conclusion of the master that the design on the part of the defendant, Weeks, in adopting and using the present trade-mark and label, and the use of the boxes and packages and names in question, was and is to deceive buyers and purchasers of the defendants' goods, and to enable them to sell their manufactures on the strength of the popularity of the goods of the plaintiffs. . . .

As has been shown, the plaintiffs assert a claim to the ownership and use of the letters "P. C. W." printed in script in a horizontal line in white, upon a dark or colored background, and this as a technical trade-mark, coupled with the fact of former registration. The defendants assert a similar claim as to the letters "W. H. W." We have therefore in the findings of fact above set forth, used the word trade-mark, without reference to its technical meaning, or attempt at criticism of the name given to the asserted rights of the parties. In Hoyt v. Hoyt, 143 Pa. 638, the court, adopting substantially the language of many cases and authors, define a trade-mark as a sign or mark by which the manufactured articles produced by one person or firm or maker, are distinguishable from those produced by rival manufacturers. The mere registration of a description and claim of a sign or mark, alleged to have been adopted and used, does not actually make a trade-mark of that which before was not possessed of the essential qualities of that species of property. It does not operate to create a title to the exclusive use of a symbol which could not be a trade-mark without registration. In other words, the recognition and protection given in general to a trade-mark rest upon principles of common law, and registration is only the means of proclaiming

to the public the evidence of ownership, to wit: the fact that the sign adopted as such has been and is in use by the proprietor. See Browne, Law of Trade-Marks, sections 376–381.

Upon the same principle a sign, device or mark originated and in actual use by another, cannot be adopted and registered by any one who takes a fancy to it, as his trade-mark, and such adoption and registration will not confer a title on him who makes it. It would be an infringement upon the original owner, and from the wrong so done no valid title could grow. Hoyt v. Hoyt, supra. . . .

A man may be adjudged a wrongdoer and yet have no intention or thought of fraud,—as where two traders take the same symbol, each in ignorance that the other uses it or with an honest doubt as to who has the legal right therein: Pratt's Appeal, 117 Pa. 401, 410, 411; Laughman's Appeal, 128 Pa. 1.

But among the essentials of a valid trade-mark, properly so called, is that of the exclusiveness in the owner of the right of its use. A person has no right to appropriate a sign or symbol which, from the nature of the fact it is used to signify, others may employ with equal truth, and therefore have an equal right to employ for the same purpose: Lauman's Appeal, supra, and cases there cited. Upon the same principle it has been held that every person may put his own name upon his own goods, notwithstanding another person of the same name may, in that name, manufacture or sell the same or similar article: Burgess v. Burgess, cited from 17 Eng. Law and Eq. 257, in Lauman's Appeal, supra. It is therefore held that as a general rule a man cannot turn his name into trade-mark. See Browne, Trade-Marks, sections 195–206. So in Pratt's Appeal, supra, which was the case of a trade-mark consisting of a cornucopia with the plaintiffs' name "Darlington," stamped upon it, the court say (page 411) " the master has found, and we think correctly, that the distinguishing feature of the plaintiffs' trademark is the cornucopia. It is a symbol, a device, which the plaintiffs have adopted to mark their butter. Had they used merely the name 'Darlington,' any other person of that name could have stamped his butter as Darlington's butter. The mere name of a person or of a place cannot, as a general rule, be appropriated as a trade-mark; at least not in the sense of preventing another person, having the same name or residing in the same place, from using it."

Assuming the correctness of the above proposition, the master fails to see how the predecessors of the respective parties to this suit could appropriate the initial letters of Peter C. Wiest and William H. Weeks, respectively, as valid trade-marks, at least in the sense of one preventing the other from using the initial letters of the latter's own name, without fraud or design to mislead the customers, of the former. The claimants in the one case, however, assert that the essential features of the trade-mark are the letters " P. C. W." and in the other that the essential features are the letters " W. H. W." . . .

There are a variety of cases where manufacturers, dealers, etc., who have adopted such devices, symbols or names, are protected against their subsequent adoption and use under circumstances amounting to fraud: Simmons Med. Co. v. Mansfield Drug Co., 23 S. W. Rep. 165 (Tenn. 1893) ; Browne on Trade Marks, 29, 30, 43, 45–47, 79, 81, 83, 87, 89, 89a–89d, 90, 91, 130, 131–134, 137, sections 386–468; Carson v. Ury, 39 Fed. Rep. 777.

In Brown et al. v. Seidel et al., 153 Pa. 60, where the master had found that there was no evidence of an attempt by the defendant to deceive purchasers, and that though there was a resemblance between the plaintiffs' and defendants' label and trade-mark, the slightest examination dispelled such appearance,—the court said, concerning these facts, " We are not prepared to say that the mere resemblance, accidental or otherwise, in the size and style of putting up packages, is of itself sufficient to justify the interference of a court of equity."

" It is only where there is a manifest intent on the part of one manufacturer to sell his goods as and for the goods of another manufacturer that the aid of equity has been successfully invoked." But as the master found the label was suggested by that of the plaintiffs, Justice MITCHELL dissented from the opinion dismissing the bill, and in the course of his opinion said: " The true rule I take to be that in case of trade-mark, proper, anything so similar as to be likely to deceive intended purchasers, may be treated as an infringment, without reference to the purpose to deceive, or to whether the resemblance is accidental or intentional. But where the imitation is with the intent to acquire, wrongfully and in an underhanded manner, a portion of another's good will or business, equity will enjoin

the attempt as a fraud, though the imitation be not of a legal trade-mark."

On the subject of the right of a person to use his own name, it was held in Croft v. Day, 7 Beav. 84, that while a person has a perfect right to use his own name in business in a way calculated to benefit him and in an honest way, he has no right to use such name in such a way as to deceive and mislead the public, and obtain for himself at the expense of the plaintiffs, an undue and improper advantage. The same principle was announced in Manufacturing Co. v. Manufacturing Co., 40 L. I. 294; Holloway v. Holloway, 13 Beav. 209; Rodgers v. Nowill, 31 Eng. Ch. 325; Sykes v. Sykes, 3 Barn. & Cress. 541.

On the authorities to which reference has been made, the master concludes: 1. That the initial letters " P. C. W." do not constitute a valid, technical trade-mark, in the sense of preventing the use by the defendants, without intent to deceive, of the initial letters " W. H. W.," which in the form adopted and in connection with the similar style of the packages, names and label, bear a close resemblance to the initials " P. C. W.," —yet that under the facts of this case as hereinbefore found, the defendants have no legal right to the use of the initials " W. H. W." in the form and upon the style of label adopted by them, and that such use constitutes a fraud upon the plaintiffs, against which they are entitled to relief.

No relief being prayed for against the use by the defendants of the particular style of boxes, and the similar names appearing thereon as indicative of the different kinds of confectionery contained therein, the question of the right of such use is not before the court, and the master concludes :

2. That an injunction should be issued restraining the defendants from using upon their labels, wrapper or marks in their business of the manufacture and sale of confectionery, the letters " W. H. W." printed in script, in white, in a horizontal line upon a red background.

3. That the plaintiffs, on their motion for that purpose, are entitled to a decree against the defendants for an account of profits made by them in selling goods not manufactured by the plaintiffs, as and for the goods of the latter, under the label of the former containing the letters " W. H. W." in script.

4. That the defendants be decreed to pay the costs of this suit.

Exceptions to the master's report were overruled by the court in an opinion by WOODWARD, J., and the following decree was entered :

Now, to wit, February 2, 1895, this cause came on to be heard at this term, was argued by counsel, and thereupon, upon consideration thereof, it is ordered, adjudged and decreed as follows, to wit :

1. That an injunction shall issue, restraining the defendants, their agents and servants, and all other persons acting for them, from using upon their labels, wrappers and marks in their business of the manufacture and sale of caramels or any other confectionery, the letters " W. H. W." printed in script letters in white in a horizontal line upon a red background.

2. That the said defendants' account with the said plaintiffs for all profits made by them heretofore in the sale of goods not manufactured by the plaintiffs, marked with the labels containing the letters " W. H. W." in script upon a red background.

3. That the cost of this suit be paid by the defendants.

*Error assigned* among others was above decree.

*G. L. Halsey* and *Alexander Farnham*, with them *Strawbridge & Taylor*, for appellants.—The weight of the testimony in this case is that an ordinary purchaser or a person of ordinary intelligence would not be likely to be deceived or misled by the defendants' labels into believing that he was purchasing the complainant's goods : Heinz v. Lutz Bros., 146 Pa. 610.

A court of equity will not restrain a person from using a device on the ground that it infringes plaintiffs' trade-mark, unless it is so similar in appearance that any person using such reasonable care and observation as the public generally are capable of using and may be expected to exercise would mistake the one for the other : Gilman v. Hunnewell, 112 Mass. 139 ; Desmond's App., 103 Pa. 126 ; McLean v. Fleming, 96 U. S. 245 ; Tallcot v. Moore, 6 Hun, N. Y. 106 ; Popham & Co. v. Cole, 66 N. Y. 69 ; Merrimac Mfg. Co. v. Garner, 4 E. D. Smith, 387. Hoyt v. Hoyt, 29 W. N. C. 315, is a case upon all fours with our case. In Heinz v. Lutz Bros., 29 W. N. C. 318, the test is the offending label must be such that it is likely to deceive persons of ordinary intelligence.

*H. W. Palmer*, with him *Stewart, Niles & Neff*, for appellee. —The findings of fact by a master sanctioned by the approval of the court below will not be set aside except for plain error: Kisor's App., 62 Pa. 428; Sproull's App., 71 Pa. 137; Kutz's App., 100 Pa. 75.

The rule simply stated is that the resemblance between two trade-marks must be such that any ordinary purchaser of the goods would be deceived by the similarity between them: Gilman v. Hunnewell, 122 Mass. 139; Desmond's App., 103 Pa. 126; Tallcot v. Moore, 6 Hun, 106; Popham & Co. v. Cole, 66 N. Y. 69; Merrimac Co. v. Garner, 4 E. D. Smith, 387; Heinz v. Brueckmann, 134 Pa. 495; Morse v. Worrell, 10 Phila. 168.

If a new and original combination of them is made, the combination, considered in its general effect on the eye and memory, is the subject of exclusive appropriation by a manufacturer as a mark of his goods: McLean v. Fleming, 96 U. S. 245; Sawyer v. Horn, 1 Fed. Rep. 24; Carbolic Soap Co. v. Thompson, 25 Fed. Rep. 625; Leclanche Battery Case, 23 Fed. Rep. 276; Frese v. Bachof, Price & Stewart's Trade-Mark Cases, 31; Landredth v. Landredth, 22 Fed. Rep. 41; Wellman & Dwire Tobacco Co. v. Tobacco Works, 46 Fed. Rep. 289; Shaw Stocking Co. v. Mack, 21 Blatch. 1; American Button Co. v. Anthony, 15 R. I. 338.

The test of infringement is similarity in general appearance, such as would be likely to mislead one in the ordinary course of purchasing the goods: Atlantic Milling Co. v. Robinson, 20 Fed. Rep. 217; Gillott v. Esterbrook, 48 N. Y. 374; Dixon Crucible Co. v. Guggenheim, 7 Phila. 408; Sawyer v. Horn, 1 Fed. Rep. 24; Hegeman v. O'Bryne, 9 Daly (N. Y.), 264; Pratt's App., 117 Pa. 401.

If the subject of a suit be a label bearing a picture or a combination of words or pictures, together with some single trade symbol or trade-mark, and the defendant has used the picture or combination, he will be adjudged an infringer, if the general effect has been copied, even though the particular trade symbol or trade-mark be omitted and the defendant's own mark or symbol be substituted: Johnson v. Ewing, L. R. 7 App. Cas. 219; Royal Baking Powder Co. v. Davis, 26 Fed. Rep. 293; Moxie Nerve Food Company v. Beach, 33 Fed. Rep. 248; Heinz v. Brueckman, 134 Pa. 495; Conrad v. Brewing Company, 8 Mo.

App. 277; Southern White Lead Company v. Cary, 25 Fed. Rep. 25.

OPINION BY MR. JUSTICE WILLIAMS, October 5, 1896 :

Monopolies of any sort have never been favorites with the law. They were held at the common law to be against public policy because against common right. The grants, charters, letters patent, or other form of device or assurance, by the sovereign for their creation were declared by the act of parliament of 21 James I. chap. 3, to be "utterly void and of none effect, and in nowise to be put in use and operation." Nothing short of the "omnipotence of parliament" is able to exclude a subject from trade in England: Bacon's Ab. vol. 7, p. 23. Two exceptions to this general rule were given by the early text writers. First, "It seemeth clear that the king may, for a reasonable time, make a good grant to any one of the sole use of any art invented or first brought into the realm by the grantee." Second, The king may grant to particular persons the sole use of some particular employments, as "of printing the Holy Scriptures, and law books," etc. The somewhat curious reason given for the second exception is that an unrestrained liberty to print the books to which it relates might be "of dangerous consequences to the public." To these exceptions a third must now be added, viz, the right of a tradesman to the exclusive use of such signs, words or symbols as he may have adopted and used in his business to distinguish articles of his own production from all similar articles produced by other persons. These exceptions do not impair the force of the general rule. Exceptio probat regulam de rebus non exceptis. The rule is unrestricted liberty in the practice of all arts and trades and in the use of the methods by which they are conducted. He who asserts the right to an exclusive privilege in any department of business must bring himself under the protection of some recognized exception to the rule. The plaintiff in this case claims an exclusive privilege under the third exception, viz, the right to the sole use of a certain trade-mark adopted, used, and registered by him; and he alleges that the defendant has adopted and is now using a trade-mark which is an imitation of, and an infringement upon, his own. It becomes important therefore to learn just what the plaintiff's trade-mark is, and then to determine whether

it has been improperly imitated by the defendant. In the bill filed in this case the plaintiff's trade-mark is fully described, and the precise form in which it is registered in the U. S. Patent Office is given as follows : " Our trade mark consists of the letters 'P..C. W.' These letters have generally been arranged as shown in the accompanying fac-simile, in which they appear as script, printed in a horizontal line upon a background of any suitable color ; but other forms of letters may be employed, or they may be differently arranged without materially altering the character of our trade mark, the essential features of which are the letters ' P. C. W.' " The business of the plaintiffs was the manufacture of confectionery goods, and particularly of that kind of confectionery known as caramels. The caramels when finished were put in boxes of various sizes and forms, which are manufactured by box makers and sold to the public generally. The plaintiff had no exclusive right to their use. They were what is known as stock boxes. When the boxes were filled the particular kind of caramel they contained was indicated by printed slips or labels pasted upon them in some suitable position, and another slip or label was placed on each box having the trade-mark " P. C. W.," which indicated that the caramels were the genuine production of the plaintiff's factory. These letters were the initials of the name of P. C. Wiest and no one but the owner of the name could rightfully use them without authority from him. The trade-mark of the defendant consisted also of the initials of the founder of the business done by it, W. H. Weeks ; and it is described in the answer and in the statement registered in the U. S. Patent Office as consisting of the letters " W. H. W." made in script, in white, on a dark ground.

The defendants are engaged in the manufacture of confectionery and state in their answer that their goods include stick candies, toy forms, caramels, plain confections, candied fruits, leaves, nuts, and the like. These when prepared for use are packed in boxes of various sizes and forms, each of which bears a slip or label indicating the variety of confectionery it contains, and another slip or label displaying the trade-mark which affords to the purchaser an assurance that the goods he is about to buy are the genuine product of the defendant's establishment. As a general proposition the right of W. H.

Weeks to the use of his name or initials as a trade-mark is as clear as that of P. C. Wiest to the use of his name or initials: Hoyt v. Hoyt, 143 Pa. 623.   They are not the same.   They do not even bear a close resemblance to each other; and the master reached the correct conclusion that there was neither imitation nor infringement shown by the evidence.   If the initials had been the same we do not see how the defendant could have been restrained from using his own, although in that case we think there should have been something in the manner of use to distinguish, and enable the public to distinguish, the product of the rival establishments from each other; and it is probable that without it a court of equity would have restrained the second comer.   But in a recent case in New York, Higgins v. Higgins Soap Co., 27 L. R. A. 42, it was held that the prior use of one's name by other persons in the same business does not destroy the right of him whose name it is to use it.   The right to use one's own name seems to have been held to be a personal right as clear in business as in personal correspondence.   We have, however, no such question here.   The master has recommended, and the court below has issued, an injunction against the defendant restraining him from the use of the letters " W. H. W." printed in script, in white, in a horizontal line upon a red background.   This decree says to the defendant, " you have a right to your trade-mark and may lawfully use it " but, going beyond the claim of the plaintiff as stated in the bill it adds, you must not use the same kind of letters, or mode of arrangement, or colors used by the plaintiff.   Now these accessories constitute no part of the plaintiff's trade-mark. The description filed in the U. S. Patent Office states that the letters are generally used in script, but may be used in any other way.

They are put upon a background of " any suitable color," no color whatever being named.   If this injunction can be sustained on the ground on which it was put in the court below, there is no style of letter, no mode of arrangement, no color in the solar spectrum, to which the plaintiffs cannot lay equal claim.   But as the plaintiffs themselves say in the description from which we have quoted, " the essential characteristic of our trade-mark is the letters P. C. W."   Those are what indicate the ownership and origin of the goods, and they carry their

assurance to the public without regard to their own shape, arrangement or color.   A tradesman can have no exclusive right to mathematical lines, to styles of printing or colors.

The master finds that the defendant has adopted boxes and packages quite like those used by the plaintiff.   The same is no doubt true of most of the confectioners in the commonwealth.   The boxes and packages are made by box manufacturers to contain an even number of pounds, or fractions of a pound, and are necessarily uniform in size and general appearance.   They are made for the trade and are sold to the trade, without discrimination.   The plaintiff and the defendant have an equal right to buy from the manufacturers; and they must buy boxes of the sizes and shapes made for, and in use by, confectioners generally.   The similarity in size and shape of the boxes does not therefore justify the master in finding that they were selected for an improper or fraudulent purpose; for the size and shape of the boxes are determined by the makers and fixed upon with a view to the accommodation of the largest number of purchasers.   The other circumstance to which the master refers as justifying his decree is the use of the same names for varieties of candies that the plaintiff had previously used, and perhaps devised.   But one who invents a machine or a new combination, or devises a new article, contributes the result of his skill and his inventive powers to the public if he does not take the necessary steps to secure himself an exclusive right to use and vend his invention.

If he does not do this he must not complain if his neighbor appropriates his invention or device to his own use, and enters into competition with him in its production and sale.   The ground on which the courts will interfere in such cases is to protect the inventor from the attempt of his neighbor to sell his own work as and for the work of the inventor.   This would be enjoined as a fraud upon both the inventor and the public; but so long as he sells his own work as his own, any man may imitate the unprotected work of any other man as closely as he is able.   We think the injunction awarded in this case cannot be sustained upon the findings of the learned master, and should be set aside.

If the defendant is really attempting to sell his own confectionery by representing it to the public as the production of the

plaintiff, this, and not an imitation or infringement of the trade-mark, should be charged in the bill as the ground of relief.

The decree is reversed.    No order is made in relation to costs.

MR. JUSTICE MITCHELL dissenting.

This is a perfectly clear case of a fraudulent effort of appellants to get a part of plaintiff's trade by such imitation of his boxes, labels, lettering, coloring, etc., as will deceive and mislead intending purchasers. It is an effort which equity ought and usually does enjoin without reference to the strict doctrine of trade-marks. For this reason I would affirm the decree.

We concur in this dissent.

DEAN, J.,
FELL, J.